UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO.

FILED
IN COURT
CHARLOTTE, N. C.

JUN 2 8 2006

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INDICTMENT 3:06CR170-V |
| | ) | |
| | ) | Violation: |
| v. | ) | 18 U.S.C. § 2319 |
| | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 2 |
| JUSTIN EMCH | ) | 17 U.S.C. § 506 |

THE GRAND JURY CHARGES:

## BACKGROUND

At all times relevant to this Indictment:

1. During the 1990s, individuals skilled in cracking digital copyright protection systems organized themselves into national and international groups called "warez" groups after the term "software." These groups are dedicated to intellectual property "piracy," that is, the unauthorized, illegal reproduction and distribution of copyrighted computer software, including utility and application software and console games, and copyrighted digital entertainment, including movies and music. Warez groups distribute pirated software, movies and music over the Internet, and compete with one another to be the first to release new, high quality pirated products, within an elaborate underground Internet society, known as the "warez scene." Due in part to the activities of warez groups, pirated versions of computer software, movies, and music are available worldwide, electronically and on optical disc, sometimes even before they are made commercially available to the public.

2. Warez groups are often structured, hierarchical organizations comprised of members in various countries who have specialized skills and roles in the piracy of digitized intellectual property. Some warez groups specialize in obtaining "pre-release" intellectual property for piracy, often from company or distribution insiders, or software testers, who have access to final versions of new products which have yet to be released to the public.

Other warez groups concentrate on "cracking" copyright protection systems by removing or otherwise circumventing copyright protection and access controls like encryption, serial numbers, tags, duplication controls, and/or security locks. Still other groups act as couriers, distributing pirated intellectual property over the Internet to warez sites worldwide.

3. Warez members typically store their pirated intellectual property on servers employing a protocol known as a file transfer protocol ("FTP") which allows other individuals to download pirated product from, and upload pirated product to, that server. Access to warez FTP servers, or sites, is nearly always password-protected, and many warez groups protect large FTP archive sites, containing tens of thousands of files of pirated software, movies, and music, through a combination of sophisticated security measures.

4. Members of the warez scene frequently communicate with each other over the Internet using "real time" software applications and closed channels, such as "Internet Relay Chat" ("IRC"), as well as encryption to avoid detection by law enforcement. As a further security precaution, most warez members conceal their Internet identities by assuming aliases, and many disguise their Internet addresses, and thus their true locations, by routing Internet communications through another computer known as a "virtual host" or "bounce box" which is configured to appear falsely as the source of the communication.

5. The reasons why individuals become members of warez groups vary. Common to virtually all warez members, however, is the desire for personal financial gain through access to vast quantities of free software, movies and music available on warez FTP sites. A few of the larger warez groups also sell their pirated product for commercial gain. Other motives in addition to profit include the thrill and social comradery members obtain through clandestine participation in the illegal activity; and the reputation and fame that attends membership and participation in the "top" warez groups.

2

## COUNT ONE
### (Conspiracy)

6. Paragraphs one through five of this Indictment are hereby realleged and incorporated as if fully set forth herein.

### I. Object of the Conspiracy

7. From in or before 2001 through September 10, 2004, both dates being approximate and inclusive, in Mecklenburg County, in the Western District of North Carolina, and elsewhere, the defendant, **JUSTIN EMCH**, did knowingly and voluntarily combine, conspire, confederate, and agree with others known and unknown to the grand jury willfully, and for purposes of private financial gain,

> (1) to infringe a copyright by the reproduction and distribution, during a 180-day period, of at least ten (10) copies of one (1) or more copyrighted works which have a total retail value of more than $2,500, in violation of Title 18, United States Code, Section 2319(a), (b)(1) and (c)(1) (2004), and Title 17, United States Code, Section 506(a)(1) and (a)(2) (2004); and

> (2) to manufacture, offer to the public, provide and otherwise traffic in a technology, product, device, component, and part thereof, that was primarily designed and produced for the purpose of circumventing (i) a technological measure that effectively controls access to a copyrighted work and (ii) protection afforded by a technological measure that effectively protects a right of a copyright owner under Title 17 of the United States Code in a work and a portion thereof, in violation of Title 17, United States Code, Sections 1201(a)(2)(A) and (b)(1)(A), and 1204(a).

3

## II. Defendant's Manner and Means within the Conspiracy

8. The ways, manner and means by which the defendant, **JUSTIN EMCH**, sought to achieve the objects of this conspiracy included, but were not limited to, the following:

   a. It was a part of the conspiracy that the defendant, **JUSTIN EMCH**, would be a member of and participate in warez groups and the warez scene. He was a founding member of the warez group "MaGE."

   b. It was further a part of the conspiracy that the defendant, **JUSTIN EMCH**, would download from warez sites and test pirated software that other warez members had "cracked" to ensure that the software continued to function after its copyright protection and access controls had been removed or circumvented, in preparation for the release and distribution of the software by warez groups.

   c. It was further a part of the conspiracy that the defendant, **JUSTIN EMCH**, would supply software to be "cracked" by other warez members and released by warez groups.

   d. It was further a part of the conspiracy that the defendant, **JUSTIN EMCH**, would download "key generators" from warez FTP sites. Key generators are software programs that generate unauthorized serial numbers to be used with pirated software to circumvent the software's access control systems.

   e. It was further a part of the conspiracy that the defendant, **JUSTIN EMCH**, would communicate with other warez group members over the Internet using IRC channels and an Internet alias.

   f. It was further a part of the conspiracy that the defendant, **JUSTIN EMCH**, would download pirated digital works, including software applications, computer

4

games, music and movies, from warez FTP sites for his own personal use.

### III. Overt Acts

9. In furtherance of the conspiracy, and to accomplish its unlawful objectives, the defendant, **JUSTIN EMCH**, from February 12, 2004, through September 4, 2004, in the Western District of North Carolina and elsewhere, uploaded or caused to be uploaded over 5 pirated digital works to, and downloaded or caused to be downloaded over 100 pirated digital works from, warez FTP sites, and each such upload and download constituted an overt act. Among these, as well as other, overt acts, to enumerate but a few, were the following:

a. On February 26, 2004, the defendant, **JUSTIN EMCH**, downloaded or caused to be downloaded loaded from a warez FTP server, located in the Western District of North Carolina, a pirated digital work known as *The Last Samurai*.

b. On March 9, 2004, the defendant, **JUSTIN EMCH**, downloaded or caused to be downloaded from a warez FTP server, located in the Western District of North Carolina, a "key generator," that is, a software program that generates unauthorized serial numbers to be used with pirated software to circumvent the software's access control system. This key generator produced unauthorized serial numbers for a software application known as *TS Census v.3.1*.

c. On March 9, 2004, the defendant, **JUSTIN EMCH**, uploaded or caused to be uploaded to a warez FTP server, located in the Western District of North Carolina, a pirated digital work known as *TS Census v.3.1*.

d. On March 25, 2004, the defendant, **JUSTIN EMCH**, uploaded or caused to be uploaded to a warez FTP server, located in the Western District of North Carolina, a pirated digital work known as *MSC Enterprise Mvision*.

5

e. On August 30, 2004, the defendant, **JUSTIN EMCH**, uploaded or caused to be uploaded to a warez FTP server, located in the Western District of North Carolina, a pirated digital work known as *Harry Potter and the Prisoner of Azkaban.*

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Copyright Infringement)

10. Paragraphs one through five of this Indictment are hereby realleged and incorporated as if fully set forth herein.

11. From on or about March 6, 2004, through August 30, 2004, both dates being approximate and inclusive, in Mecklenburg County, in the Western District of North Carolina, and elsewhere, the defendant, **JUSTIN EMCH**, willfully, and for purposes of private financial gain, did infringe a copyright by the reproduction and distribution, during a 180-day period, of at least ten (10) copies of one (1) or more copyrighted works which have a total retail value of more than $2,500.

All in violation of Title 18, United States Code, Sections 2319(a), (b)(1) and (c)(1) (2004), and 2, and Title 17, United States Code, Section 506(a)(1) and (a)(2) (2004).

### **Forfeiture Allegations**

12. The allegations in this Indictment are realleged as if fully set forth here, for the purpose of alleging forfeiture, pursuant to Title 17, United States Code, Sections 506(b) and 509.

13. If convicted of the offense set forth in the Indictment, **JUSTIN EMCH**, the defendant herein, shall forfeit all infringing copies, all equipment used in the manufacture of infringing copies, all articles by means of which infringing copies may be reproduced, and

all devices for manufacturing, reproducing or assembling infringing copies. Such property includes, but is not limited to, the following specific items found in the possession and residence of **JUSTIN EMCH** on or about September 10, 2004:

    a.     One Compaq Presario 1500 laptop computer, S/N 1V2AKQFZW431
    b.     One Compaq Presario 1500 laptop computer, S/N 5Y1BKDKPX0SK
    c.     One Dell Poweredge 650 S/N 305KQ31
    d.     One Dell Poweredge 650 S/N JH0VQ31
    e.     One Generic Computer Tower, no serial number
    f.     Multiple hard drives, CD Roms, DVDs, floppy disks and tapes containing infringing digital material

DATED:                                A TRUE BILL.

GRETCHEN C. F. SHAPPERT
United States Attorney

*[signature]*

ERIC J. KLUMB
Senior Counsel
U.S. Department of Justice

7